IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:17-cr-478-WKW |
| | ) | |
| TYRELL ANTHONY TURNER | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Currently pending before the court is Defendant Tyrell Anthony Turner's Motion to Suppress (Doc. 17). In the motion, Defendant Turner argues that law enforcement officers' warrantless entry into his apartment violated the Fourth Amendment. *See generally* Doc. 17. Thus, he seeks an order from the court suppressing "any items seized, statements made, and any fruits of those items and statements, obtained as a result of the illegal search of Mr. Turner's apartment and/or Mr. Turner's unlawful arrest." Doc. 17 at 1.

The Government responded (Doc. 29) to Defendant Turner's motion, and on December 15, 2017, the undersigned conducted an evidentiary hearing on the matter, at which the Government presented evidence as to the lawfulness of the entry. Defendant Turner's motion is now ripe for recommendation to the United States District Judge. Upon consideration of Defendant Turner's motion, the Government's response, and the evidence and testimony adduced at the evidentiary hearing, the undersigned Magistrate Judge RECOMMENDS that the motion to suppress (Doc. 17) be GRANTED.

## I.     FINDINGS OF FACT[1]

On November 8, 2016, at approximately 10:28 a.m., a 911 call was placed to the Montgomery Police Department. Def.'s Ex. 2 (911 Call Log) (Doc. 32-3) at 4. The 911 caller reported that she witnessed two males fighting outside of an apartment in the Peppertree Apartment complex, and that one of the males shot the other male. Def.'s Ex. 1 (911 call) 0:15-0:22.[2] The caller stated that the shooter then picked up the gun, ran, hopped into a tan Cadillac with two or three other males, and drove away from the apartment complex. (911 call) 0:44-0:50; 1:04-1:09. When asked by the operator whether the individual who was shot was still outside, the caller replied that she did not see him, but that she did see his girlfriend, and provided the operator with a description of the girlfriend's clothing. (911 call) 2:00-2:16; 2:45-2:52. The caller also provided her address for the responders. (911 call) 0:10-0:14; 2:45-2:52.

When the 911 call was placed, several Montgomery Police Department officers were eating breakfast at a nearby Chappy's Deli. Tr. I-4:22-I-5:8. Those officers, after receiving "real-time" information from dispatch about the events that had occurred at the Peppertree Apartment Complex, responded to the scene within a couple of minutes. Tr. I-

---

[1]  The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

[2] The undersigned will use the above-styled "minute:second" format to designate the time at which relevant events occurred on the audio recording of the 911 call. As a point of clarification, this format does not indicate the time of day that the events occurred.

22:19-I-23:3. According to the 911 call log narrative, the responding officers were provided with the following information:

| | |
|---|---|
| 11/8/2016 10:28:57 AM | 2 males was in code 9[3] |
| 11/8/2016 10:29:15 AM | one of the male shot one of the male |
| . . . | |
| 11/8/2016 10:29:34 AM | subj wearing all black |
| 11/8/2016 10:30:01 AM | subj left tan cad headed out of the peppertree apt |
| 11/8/2016 10:30:40 AM | shot victim may not be 10*17[4] |
| 11/8/2016 10:30:56 AM | victim girlfriend is 10*17 |
| 11/8/2016 10:31:31 AM | female wearing black shirt with green writing is outside on the phone |
| 11/8/2016 10:32:32 AM | NO CODE 6 |
| 11/8/2016 10:33:19 AM | 10*11 FOR MEDICS |

Def.'s Ex. 1A (911 Call Log) (Doc. 32-3) at 2.

Lieutenant David Wizorek and Sergeant Derrick Boykin were two of the officers who first responded to the scene. Tr. I-7:2-4; I-22:24-I-23:3. When they arrived, Sergeant Boykin observed bullet casings on the ground outside of the apartment. Tr. I-14:9-18. Lieutenant Wizorek found pine straw, which landscaped a nearby tree, strewn about. Tr. I-

---

[3] When asked by the undersigned at the evidentiary hearing what a Code 9 is, Agent Jeffrey Ioimo, the case agent, replied that a Code 9 is a fight. Tr. II-21:24-25.

[4] When asked by the undersigned at the evidentiary hearing what a 10*17 is, Agent Jeffrey Ioimo replied that a 10*17 is "on the scene." Tr. II-21:24-II-22:1.

25:14-25. Ms. Shabrika Farris, the lessee of the apartment[5] and the girlfriend of Defendant Turner who was identified by the 911 caller, was outside by the stairwell, along with Defendant Turner. Tr. I-24:3-10. Neighbors who lived in the upstairs apartment across from Defendant Turner's were standing outside on their balcony. Tr. I-23:10-18. They reported down to officers that two men had been involved in a fight, and that one was possibly shot. Tr. I-23:10-18.

Lieutenant Wizorek spoke with Ms. Farris outside of the apartment. I-24:3-10. A female officer responding to the scene captured a portion of that conversation on her body camera. Tr. I-26:11-25. As provided by the body camera footage, Ms. Farris stated that she was cleaning the bathroom of the apartment when she heard a voice that did not belong to Defendant Turner. Def.'s Ex. 3 (Body-camera video ("BCV")) 2:50.[6] When she opened the bathroom door, she saw Defendant Turner and an individual known as "Big Hommie" running out of the apartment. BCV 2:50-3:00. The female officer's body camera also captures Defendant Turner recounting the events that occurred outside. BCV 1:40-1:54. Defendant Turner stated that he and Big Hommie wrestled "on the ground," and that Big Hommie "shot his gun" at Defendant Turner's face. BCV 1:50. From the footage in

---

[5] For purposes of the motion to suppress, the Government does not contest Defendant Turner's standing to challenge the officers' entry into the apartment. Tr. I-2:20-I-3:9.

[6] The undersigned will use the above-styled "minute:second" format to designate the time at which relevant events occurred on the body-camera video. As a point of clarification, this format does not indicate the time of day that the events occurred.

evidence, neither Defendant Turner or Ms. Farris indicate that anyone other than Defendant Turner and Big Hommie were involved in the actual altercation.[7]

Early in the video footage—before either Defendant Turner or Ms. Farris provided their accounts of the incident referenced above—Lieutenant Wizorek asked Ms. Farris if she had just been in the apartment. BCV 1:20. Ms. Farris affirmed that she had been in the apartment, but reported that there was "no one else in there, though."[8] BCV 1:27. During that conversation, officers ascended the stairs to Defendant Turner's apartment.[9] BCV 1:21. Immediately after Ms. Farris's statement to Lieutenant Wizorek, both she and Defendant Turner respond to Lieutenant Wizorek's questioning about Big Hommie. They relay what he was wearing, and state that he ran away from the apartment. BCV 1:25-1:42. Lieutenant Wizorek can be heard questioning an unidentified individual, presumably the upstairs neighbor, regarding Big Hommie's departure, and can be heard repeating the unidentified individual's statement that Big Hommie drove away in a tan Cadillac. BCV 3:49-4:05.

---

[7] At approximately 2:55 in the video, Ms. Farris states to the female officer that there was only one person who entered the apartment.

[8] The Government argues that the video footage actually captures Ms. Farris stating that there *is* somebody else in the apartment. *See* Doc. 29 at 2. The undersigned, after reviewing the footage multiple times, disagrees, and finds that Ms. Farris stated that "there's nobody else in there, though."

[9] It is not clear from the testimony and evidence how officers knew which apartment was connected to Ms. Farris and Defendant Turner. As noted above, the 911 caller provided her address at the apartment complex, and a description of Ms. Farris. (911 call) 0:10-0:14. Presumably, then, upon arrival at the scene, officers received information from Ms. Farris and/or Defendant Turner regarding which apartment was theirs. From the body camera video in evidence, it appears that this presumption is supported by what appears to be Ms. Farris speaking with officers and pointing up towards her apartment. BCV 0:41. Nonetheless, the Government did not tease this evidence out at the hearing, and, thus, the undersigned merely speculates as to how officers knew which apartment to enter.

Shortly after officers entered the apartment,[10] Defendant Turner and Ms. Farris are told to place their hands behind their backs. BCV 8:47-8:50. They are cuffed, and informed that they are being detained until detectives arrive to talk with them further about what was found in the apartment. BCV 9:00-9:35.

Sergeant Boykin testified that, at the time of his entry into the apartment, he was aware that the 911 caller reported that the shooter fled in a tan Cadillac. Tr. I-13:11-17. He also stated that he knew, upon arrival, that some sort of altercation had occurred outside the apartment due to observing shell casings on the ground. Tr. I-13:18-20; I-14:9-22. He testified that when he arrived at the scene, he received information from Defendant Turner and Ms. Farris regarding the incident that had occurred. Tr. I-7:3-I-9:5. According to Sergeant Boykin, Defendant Turner indicated that he had been robbed, and Ms. Farris indicated that the incident "occurred inside the apartment." Tr. I-8:10-16. Sergeant Boykin also testified that, when asked whether the perpetrator or perpetrators were still inside the apartment, both Defendant Turner and Ms. Farris stated that they did not know. Tr. I-8:11-20. Sergeant Boykin testified that, because Ms. Farris was unable "to acknowledge the fact that [the suspects] were actually inside the apartment or not," "for officer safety we went inside to clear the residence because we didn't know if the suspects had actually stayed on the inside or actually fled the scene." Tr. I-8:21-I-9:5. Although officer safety was a concern, Sergeant Boykin admitted that he, personally, did not advise the neighbors who

---

[10] There is no evidence that either Ms. Farris or Defendant Turner consented to the officers' entry into the apartment.

6

were standing on their balcony across from Defendant Turner's apartment to return inside their residence.[11] Tr. I-16:23-I-17:18.

Lieutenant Wizorek was not one of the officers who initially entered the apartment; however, he testified that the reason for the warrantless entry was two-fold. First, Lieutenant Wizorek believed the warrantless entry was necessary in order to secure the residence. Tr. I-26:1-10; I-30:22-I-31:10. While he did not believe there was an "active shooter" situation, Tr. I-39:12-22, he stated that officers needed to ensure that the suspect, or suspects, were not inside, Tr. I-52:2-13. Second, Lieutenant Wizorek believed the warrantless entry was necessary in order to search for potential gunshot victims, as the 911 call clearly placed the officers on notice that someone had been shot. Tr. I-30:24-I-31:10. In a memorandum composed on the day of the incident, Lieutenant Wizorek states that officers cleared the apartment for the potential suspect, "as [Ms.] Farris advised one entered her apartment[,]" but does not mention that officers entered to search for injured persons. Doc. 32-3 at 9.

Sergeant Boykin and the other officers who entered the apartment observed "an unknown quantity of a green leafy substance believed to be Marijuana in plain view lying on the dinner table of the residence[.]" Doc. 32-3 at 11. They also observed "two clear plastic bags containing a green leafy substance believed to be Marijuana in plain view" on a dresser in the bedroom. *Id*. Based upon these observations, a detective in the Montgomery

---

[11] While Sergeant Boykin testified that one of the other officers ordered the neighbors away from the front area, no such statement is heard on the body camera footage in evidence, and it appears that the neighbors remained on their porch during officers' entry into the apartment. Tr. I-17:14-24.

Police Department executed an affidavit in support of a search warrant for the apartment. *See generally id*. The search warrant stated that the initial warrantless entry into the apartment occurred because Ms. Farris "could not advise officer's [sic] if the suspect involved in the altercation had possibly returned to the apartment." Doc. 32-3 at 11. Thus, the warrant states that "[d]ue to the suspect possibly being inside of the residence, patrol units entered and cleared the residence[,]" and, in the process, made the observations set forth above. *Id*. The search warrant issued, and, as a result of its execution, evidence was seized that forms the basis of the charges against Defendant Turner.

## II.   THE PARTIES' ARGUMENTS

In his motion to suppress, Defendant Turner argues that "any items seized, statements made, and any fruits of those items and statements, obtained as a result of the illegal search of [his] apartment and/or [his] unlawful arrest" should be suppressed.[12] Doc. 17 at 1. Defendant Turner specifically asserts that officers entering the apartment did not have reason to enter to conduct a protective sweep of the premises. *Id*. at 3.

In a two-and-a-half page response, the Government argues that the facts surrounding the entry of the apartment indeed give rise to exigencies making the warrantless entry permissible under the Fourth Amendment. *See generally* Doc. 29. In support of this position, the Government asserts officers had reasonable, articulable facts under which they were justified in entering the apartment without a warrant in order to conduct a protective sweep. *Id*. at 1. Specifically, the Government relies upon Ms. Farris's statement to

---

[12] Although Defendant Turner asks the court to suppress statements he made in conjunction with the search of the apartment and/or his arrest, he does not specifically identify which statements he wishes suppressed.

Lieutenant Wizorek regarding whether anyone was inside Defendant Turner's apartment as a "key issue" in the determination of whether officers had the requisite facts to enter the apartment without a warrant. *Id*. at 2.

Because of the testimony solicited by the Government at the evidentiary hearing before the undersigned, the Government also relies upon the officers' need to search for potential shooting victims as justification for their warrantless entry into the apartment. Tr. II-17:10-11; II-19:22-II-21:3. In response to this position, Defendant Turner argues that the entering officers did not have articulable facts that someone was injured inside the apartment, and, thus, the exception does not apply. Tr. II-14:19-24.

## III.   DISCUSSION

The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Under the Fourth Amendment, searches and seizures 'inside a home without a warrant are presumptively unreasonable.'" *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). One such exception is based upon the presence of "exigent circumstances," *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971), in which there is a compelling need for official action, but no time for law enforcement to secure a warrant, *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (applying the exigent circumstances exception when "the exigencies of the situation make the needs of law

enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment"). The exigent circumstances doctrine extends to situations involving "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway,* 290 F.3d 1331, 1334-35 (11th Cir. 2002). The most urgent of these exigencies is "the need to protect or preserve life" in an emergency situation. *Id*. at 1335. The Government bears the burden of demonstrating that an exception to the warrant requirement applies, and that burden is heavy. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify [a] warrantless search[.]").

Here, the Government relies upon two exceptions to the warrant requirement: (1) the emergency-aid exception, and (2) the need to perform a protective sweep. The undersigned will address both, in turn.

### A.    *The Emergency-Aid Exception*

The emergency-aid exception allows warrantless entry into a home in order to "protect or preserve life" in an emergency situation. *Kentucky v. King*, 564 U.S. 452, 459 (2011); *Brigham City,* 547 U.S. at 403-04 (holding that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury"). "In order for the exception to apply, officers must have an objectively reasonable belief that someone inside is 'seriously injured or threatened with such injury,' and is in need of immediate aid." *Brigham City*, 547 U.S. at 403-04. While courts have held police officers' belief that someone inside a home needs

immediate assistance objectively reasonable under varying circumstances, the circumstances "have in common the indicia of an urgent, ongoing emergency, in which officers have received emergency reports of an ongoing disturbance, arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior." *United States v. Timmann*, 741 F.3d 1170, 1179 (11th Cir. 2013). Whether exigent circumstances exist to justify a warrantless search under the emergency-aid exception is judged case by case on the totality of the circumstances. *Missouri v. McNeely*, 569 U.S. 141, 145 (2013).

Based upon the testimony presented at the hearing before the undersigned, the Government argues that the entry into the apartment was justified because officers were concerned that an individual might be injured inside the apartment.[13] However, the undersigned concludes that the facts—as set out below—do not lead to an objectively reasonable belief that someone was seriously injured inside the apartment and in need of immediate aid. Therefore, the undersigned finds that the emergency-aid exception should not apply.

Whether the emergency-aid exception should apply necessarily requires officers to have (1) a reasonable belief that someone is seriously injured and in need of immediate aid; and (2) a reasonable belief that the seriously-injured individual is located inside a particular structure. The undersigned first examines the evidence as it relates to the

---

[13] The undersigned notes that this basis for the warrantless entry was first presented by the Government at the evidentiary hearing and was, therefore, not briefed by the parties. However, despite the Government's burden to show that the exception applies, the Government presented no case law at the evidentiary hearing in support of the application of the exception, nor did the Government request the opportunity to brief the issue further, post hearing.

officers' reasonable belief that an individual was seriously injured as a result of the incident that was reported to have occurred at the apartment complex. Officers knew, at the time of entry into the apartment, via a 911 caller and witnesses on the scene, that two men were involved in an altercation in which a gun was fired. They knew that one of those men—the purported shooter—fled in a tan Cadillac with two or three other men, whom no one reported to be inside the apartment or immediately outside of the apartment at any point during the initial altercation. They also knew that Defendant Turner—the potential gunshot victim—was unharmed and outside of the apartment when police arrived. Finally, they knew that Ms. Farris—the other individual reported to have been in the apartment—was unharmed and outside of the apartment upon their arrival. With the witness and the potential victim of the altercation accounted for, and with no other indications that a serious injury had occurred—i.e., the officers did not observe blood on the scene or hear anyone's cries for help—the undersigned cannot conclude that the officers entering the apartment possessed an objectively reasonable belief that someone was seriously injured and in need of emergency aid.

Even if the undersigned could conclude that the first hurdle was jumped, the undersigned would also have to conclude that officers possessed a reasonable belief that a seriously-injured individual was located *inside* Defendant Turner's apartment. Thus, assuming *arguendo* that officers reasonably believed that an individual was seriously injured as a result of the altercation, the undersigned turns to examine the evidence as it relates to whether officers possessed a reasonable belief that such an individual was located inside the apartment. Importantly, there is no evidence to indicate that any *violent* activity

occurred inside the apartment; instead, the evidence points directly otherwise.[14] First, the evidence from the 911 call indicates that two men were involved in an altercation; that one of the men shot the other; and that the shooter picked up the gun and ran. This evidence supports the conclusion that the caller saw the altercation *outside* of the apartment. Second, the physical evidence at the scene indicates that the altercation occurred outside. Indeed, outside of the apartment, there was pine straw strewn about and shell casings lying on the ground. There was no evidence of forced entry into the apartment, or bullet holes riddling the exterior walls. Finally, officers did not report hearing a commotion or cries for help from inside the apartment. In fact, there is no evidence that any noise of any kind was heard by officers as they approached the apartment door. Therefore, the undersigned cannot conclude that, under these circumstances, officers held a reasonable belief that a seriously-injured individual was located inside Defendant Turner's apartment.

In addition to the lack of facts supporting a reasonable belief that a seriously-injured individual was inside Defendant Turner's apartment, the undersigned would also note that there were no indicia of an urgent, ongoing emergency when officers arrived at the scene. While 911 calls are undoubtedly a reliable source to alert officers that an emergency situation is transpiring, the 911 caller here indicated that the disturbance had abated, for all intents and purposes, when the shooter fled the scene with his posse in a vehicle. There were no reports of continued gun shots or an ongoing altercation from other callers. There

---

[14] The undersigned clarifies that there is evidence that *something* began inside the apartment, but that there is no evidence that any violent act occurred inside. A lack of evidence showing that violent activity occurred inside the apartment is important in assessing whether officers had a reasonable belief that someone was seriously injured inside.

were no reports that the potential shooter or any of the individuals with him had returned to the scene to exact more mayhem. When officers arrived, both Defendant Turner and Ms. Farris were outside of the apartment and, while a bit frantic in their communication of information, they were able to clearly relay to officers the events that had transpired. Thus, to the extent indicia of an urgent, ongoing emergency is required in order to conclude that the emergency-aid exception applies, those signs are absent, in this case. As such, the undersigned would be strained to conclude that the lack of emergency, particularly considered in combination with the lack of evidence suggesting that anyone was seriously injured inside the apartment, warrants application of the emergency-aid exception.

To be sure, preserving life is of the utmost importance when officers respond to a scene that indicates an individual is in need of emergency aid. In those situations, the Fourth Amendment must give way and allow officers to enter a home in order to provide immediate assistance. However, the need to provide emergency aid is an *exception* to the warrant requirement, and the Government must meet its burden of showing that officers had a reasonable belief that a seriously-injured individual inside a dwelling is in need of emergency aid in order to justify a warrantless entry. The undersigned believes that such a reasonable belief is not formed merely from a 911 call reporting shots fired, and from reports that something—not necessarily even a scuffle—began inside an apartment without further indication that violence actually occurred inside the apartment. This is particularly so when all potential victims are accounted for outside of the apartment. To hold otherwise would give much liberty to the police, under the guise of the undeniably sympathetic search for possible victims of violent behavior, to enter residences without a warrant, and would

erode the narrowly-constructed emergency-aid exception. With that concern in mind, the undersigned concludes that the Government has failed to meet its burden of showing that the emergency-aid exception to the Fourth Amendment's warrant requirement applies.[15] [16]

## B.    *The Need to Conduct a Protective Sweep*

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494

---

[15] *See Walters v. Freeman*, 572 F. App'x 723, 727-78 (11th Cir. 2014) (holding that the emergency-aid exception did not apply to an officer's warrantless entry into a home where the officer was dispatched to the scene for a report of a domestic disturbance and, when he arrived, the parties were separated and not interacting and there were no reports of a physical altercation); *Timmann*, 741 F.3d at 1180 (holding that entry into the defendant's home did not bear the "indicia of an urgent, ongoing emergency," where officers received a service call regarding what appeared to be a bullet hole in a dwelling made approximately 39 hours prior to entry, and there was no tumultuous or chaotic scene upon arrival, thus making the emergency-aid exception inapplicable); *Holloway v. Vargas*, 535 F. Supp. 2d 1219, 1225-26 (D. Kan. 2008) (holding that there was insufficient evidence to demonstrate exigent circumstances to enter a residence without a warrant where officers encountered a man with a gun outside of his residence who was generally unresponsive to commands and inquiries).

[16] *But see United States v. Dabrezil*, 603 F. App'x 756, 759 (11th Cir. 2015) (holding that the emergency-aid exception applied where officers received a 911 call from Dabrezil's frantic and screaming live-in girlfriend who reported injuries and requested rescue); *Brigham City*, 547 U.S. at 406 (holding that the emergency-aid exception applied to the warrantless entry of officers who witnessed an ongoing altercation inside a home at 3:00 a.m. between a juvenile and several adults); *United States v. Tennis*, 309 F. App'x 312, 314-15 (11th Cir. 2009) (holding that "officers were reasonable in their assumptions and in their actions to enter the apartment" based upon the "agitated and impaired state of Tennis, the noises the officers heard emanating from the apartment, and the fact Tennis said he had an argument with his girlfriend"); *Holloway*, 290 F.3d at 1338 (holding that the emergency-aid exception applied where officers received two 911 calls reporting multiple gunshots and arguing at a particular address; when officers arrived at the scene, they found the defendant and his wife outside the mobile home, observed a neighbor emerge from behind a horse trailer, and saw a child appear in the doorway of the mobile home); *United States v. Huffman,* 461 F.3d 777, 784 (6th Cir. 2006) (holding officers' warrantless entry was proper to make sure no one was injured inside when police responded to a 911 call of gunshots and saw multiple bullet holes in windows and inside walls and furniture); *United States v. Brooks,* 367 F.3d 1128, 1135-36 (9th Cir. 2004) (warrantless entry upheld where officers heard sounds of a woman being beaten and knew the parties were still co-located in a hotel room); *Tamez v. City of San Marcos,* 118 F.3d 1085 (5th Cir. 1997) (holding entry lawful where officers responded to a "shots fired" call and could hear noise in the house, but could not determine whether anyone was inside the house); *United States v. Donlon,* 909 F.2d 650 (1st Cir. 1990) (holding exigent circumstances exception applied where police entered home where there was a report of gunshots and children upstairs), *overruled on other grounds by United States v. Omar,* 104 F.3d 519, 522-23 (1st Cir.1997)).

U.S. 325, 327 (1990). A protective sweep may also be undertaken without an arrest warrant, so long as the officers are lawfully within the premises due to, for example, the existence of exigent circumstances. *United States v. Caraballo,* 595 F.3d 1214, 1224–25 (11th Cir. 2010). The Fourth Amendment permits protective sweeps "if the searching officer 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing,' that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327 (internal citations omitted). "A mere lack of information about who or what is inside a building is not enough to justify a protective search of that building." *United States v. Reynolds*, 526 F. Supp. 2d 1330, 1339 (N.D. Ga. 2007) (citing *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (holding that protective sweeps may not be carried out on the strength of an "inchoate and unparticularized suspicion or hunch")); *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) (noting that "there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course[.]").

As noted above, "[i]n order to perform a protective sweep that comports with the requirements of the Fourth Amendment, the officers must in the first place be lawfully within the premises." *Timmann*, 741 F.3d at 1181-82. Because the undersigned concluded previously that the emergency-aid exception does not apply and, thus, officers' entry was unreasonable under the Fourth Amendment on that basis, the emergency-aid exception cannot provide the exigent circumstances needed to perform the protective sweep.

16

*Caraballo,* 595 F.3d at 1224–25 (noting that a protective sweep may also be undertaken without an arrest warrant, so long as the officers are lawfully within the premises due to, for example, the existence of exigent circumstances). Therefore, the Government must show that exigent circumstances of another kind are present in order to apply the protective sweep exception.

The Government attempts to do so based upon the officers' reasonable belief "that an armed suspect was within the apartment." Doc. 29 at 2. Although a closer call than an application of the emergency-aid exception, the undersigned concludes that the facts do not support that the entering officers possessed a reasonable belief, based on specific, articulable facts and the rational inferences therefrom, that the apartment in question harbored an individual posing a danger to officers or others.

Supporting the conclusion that the protective sweep exception should be applied, both Sergeant Boykin and Lieutenant Wizorek testified that they had the impression from conversations with Defendant Turner and/or Ms. Farris that a perpetrator could possibly be inside the apartment. Specifically, Sergeant Boykin testified that he heard Lieutenant Wizorek receiving information from Ms. Farris, and that Ms. Farris stated "she didn't know" whether the perpetrator "or perpetrators" were inside the apartment. Tr. I-8:6-15. Sergeant Boykin also testified that Defendant Turner, like Ms. Farris, was unable to state whether anyone else was in the apartment, and that something—possibly a robbery— occurred on the inside of the apartment. Tr. I-7:14-I-8:3; I-8:16-20. Also, Lieutenant Wizorek testified regarding his initial conversation with Ms. Farris that was not captured on the body camera video. His recollection of the conversation is as follows:

> We asked her what was going on. I believe that she said that she ran out the door because somebody had come in the door. You know, I don't recall, you know, the — we got a description of that individual, but that somebody had come out the door and she fled out of — out of the door. And, again, that there was possibly somebody still inside the house is the indication I took from her.

Tr. I-24:24-I-25:9. Regarding Ms. Farris's statement (captured by the body camera video) that no one else was in the apartment, Lieutenant Wizorek testified that, based upon his recollection of what happened, Ms. Farris stated that there was someone else in there. Tr. I-29:21-I:30-1.

Cutting against the application of the protective sweep exception is portions of testimony from Sergeant Boykin. As an entering officer, Sergeant Boykin testified that he was privy to the facts of the 911 call. Tr. I-13:1-10. That call established that two men had been involved in a fight outside of an apartment in the Peppertree Apartment Complex. Tr. I-13:11-14; I-14:5-8. The call also established that one of those men, whom the caller identified as the shooter, picked up the gun, ran, jumped into a tan Cadillac with two or three other men, and fled the scene. There is no evidence to indicate that the shooter returned to the scene after the initial altercation or that any of the individuals with him remained in the area. Nor is there any evidence that the officers entering the apartment heard commotion inside, saw movement, or otherwise had any articulable reason to form a belief that an individual—dangerous or not—was within the walls of the apartment. Finally, although not a fact to hang a hat upon, the undersigned finds it peculiar that, if officers were concerned about their safety because of a gun-toting individual inside, that

innocent bystanders were allowed to remain on their balcony as officers entered the apartment and conducted the sweep.

Having noted the facts supporting both sides, the undersigned turns to discuss whether, based upon these facts, officers had an objectively reasonable belief that Defendant Turner's apartment harbored an individual posing a danger to officers or others. Arguably, the only articulable "fact" presented by the Government that someone dangerous was inside the apartment was the testimony from Sergeant Boykin and Lieutenant Wizorek that, based upon their conversations with Defendant Turner and Ms. Farris, someone could possibly be inside. However, the undersigned finds this testimony odd considering a review of the body camera video. Although the body camera video does not capture any of the conversation between Sergeant Boykin and Defendant Turner or Ms. Farris, the video does show both Defendant Turner and Ms. Farris stating, after Sergeant Boykin and another officer were already making their way into the apartment, that Big Hommie fled the scene. If the undersigned were to believe that Defendant Turner and Ms. Farris told Sergeant Boykin that they did not know whether the perpetrator was still inside the apartment, such a conclusion would be difficult to reconcile with the irrefutable evidence on the body camera—just moments later—indicating their belief otherwise. It is also clear from the body camera video that the neighbors who witnessed the event were confirming to officers that Big Hommie fled in a tan Cadillac with two or three other men. Thus, considering all of the evidence on the body camera video that reported Big Hommie fled the scene with the other men (who were not reported to have been at the scene of the altercation in the first place), it would be odd to the undersigned if Defendant Turner and Ms. Farris were

reporting to officers that they were unsure whether the perpetrator was still inside the apartment just seconds before they stated otherwise.[17]

To be sure, the undersigned does note that it is difficult to discern, from the portion of the body camera video in evidence, whether Ms. Farris states that there is someone—or isn't someone—in the apartment. A lack of clarity in her diction explains why one listener may hear "there's someone else in there, though," while another listener may hear "there's no one else in there, though." However, there is no evidence that the entering officers heard that particular statement, or, if they did, that they believed Ms. Farris stated there was someone else in the apartment.[18] Thus, the undersigned is left with the testimony of Sergeant Boykin that he entered the apartment based upon Ms. Farris's and/or Defendant Turner's inability to confirm that there was not anyone else in the apartment. Even if such

---

[17] Clearly, just because Defendant Turner and Ms. Farris stated that Big Hommie fled the scene does not necessarily result in the conclusion that Defendant Turner and Ms. Farris were saying that no one was remaining in the apartment. However, there is no evidence that Defendant Turner or Ms. Farris reported that anyone other than Big Hommie was involved in the altercation with Defendant Turner; therefore, it would not be reasonable to infer that they were indicating to officers that someone else other than Big Hommie possibly remained in the apartment when it appears, at least by the evidence before the undersigned, that they believed Big Hommie to be the only individual involved in the altercation.

[18] Although the Government has not advanced the argument that the doctrine of collective knowledge of the officers should apply, the undersigned has not located any cases in which the Eleventh Circuit has applied the doctrine to justify a protective sweep of a residence. However, assuming *arguendo* that the doctrine could or should be applied in this situation, the court would require evidence that the entering officers maintained at least minimal communication with the other officers who possessed separate factual knowledge. *See United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990) (noting that "when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause") (citing *United States v. Else*, 743 F.2d 1465, 1476 (11th Cir. 1984)). Here, the evidence before the court is the testimony of an entering officer, Sergeant Boykin, and his supervisor, Lieutenant Wizorek. While both officers were undoubtedly on the scene together and gathering some of the same information, the Government has not put forth any evidence that Lieutenant Wizorek communicated any of his knowledge to Sergeant Boykin. Thus, because the undersigned will not assume that an open line of communication existed, the undersigned concludes that whether the entry violated the Fourth Amendment depends upon the knowledge of Sergeant Boykin as the entering officer, and not the collective knowledge of the officers.

testimony from Sergeant Boykin were fully credited,[19] the undersigned does not find that it is enough to justify a warrantless entry based upon the need to conduct a protective sweep. Indeed, case law suggests that a mere suspicion that an individual could be within a dwelling is not enough to permit warrantless entry. *See Reynolds*, 526 F. Supp. 2d at 1339 (comparing and contrasting cases in which protective sweeps were held valid and invalid); *but see United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) (holding that a protective sweep was valid where officers knocked on the door of a house and the individual who answered stated no one else was there; however, officers had observed a man previously enter the house (who eventually came to the door) and three cars in the driveway); *United States v. Roof*, 103 F. App'x 652, 658 (10th Cir. 2004) ("A mere absence of information about whether anyone remains in a home does not justify a protective sweep."); *United States v. Yarbrough*, 4:17-cr-00131-KOB-HNJ, 2018 WL 317711, at *6

---

[19] In addition to the fact that Sergeant Boykin's testimony regarding Defendant Turner's and Ms. Farris's statements is difficult to reconcile with the statements captured by the body camera video, there are also discrepancies in Sergeant Boykin's testimony that cause the undersigned to pause. Specifically, the undersigned notes that Sergeant Boykin testified that his first encounter with Defendant Turner was not at the Peppertree Apartment Complex but, instead, was in the parking lot of Chappy's Deli. Tr. I-4:20-I-7:4. Sergeant Boykin states that, after hearing the 911 call over the radio, he observed Defendant Turner running through the parking lot of Chappy's Deli. Tr. I-5:13-15; I-6:10-18. He stated that he, Lieutenant Wizorek, and other officers had an initial encounter with Defendant Turner at this location, that Defendant Turner informed them he had been robbed, and that he led officers back to the location where it occurred. Tr. I-6:5-I-7:4. Peculiarly, Lieutenant Wizorek, who was also at Chappy's, did not testify as to this encounter, and, instead, indicated in response to the 911 call, he "[r]an out the door [of Chappy's] jumped in [his] car[ ], and headed over [ ] to the scene[.]" Tr. I-22:19-I-23:3. Second, Sergeant Boykin testified that, at the time of his entry into the apartment, Defendant Turner and Ms. Farris were already detained outside because of the nature of the situation and not knowing whether they were suspects or witnesses. Tr. I-10:12-18. This testimony is contradicted by the testimony of Lieutenant Wizorek and the body camera video, which clearly provide that Defendant Turner and Ms. Farris were not detained until after the entering officers made observations of potentially illegal activity inside. Notably, Sergeant Boykin did not write a report or compose any sort of memorandum regarding the incident. Thus, because of the discrepancies mentioned here and the lack of documentation of the incident by Sergeant Boykin, the undersigned concludes that Sergeant Boykin's recollection of the events transpiring that day may be unreliable.

(N.D. Ala. Jan. 8, 2018) (holding that the Government did not satisfy their burden to prove that the protective sweep exception applied where the officers did not testify that "they actually believed anyone other than Mrs. Yarbrough was inside the house"; instead, the closest they came was agreeing with the prosecuting attorney's suggestion that "someone could possibly be inside the home still"). And, without any other fact indicating that someone was inside the apartment—i.e., reports that the perpetrator returned, noises or commotion coming from the apartment, etc.—the undersigned cannot conclude that the officers were justified in entering the apartment without a warrant or without the permission of Ms. Farris and/or Defendant Turner in order to conduct a protective sweep.

The undersigned notes that officer safety and the safety of the public are, of course, of utmost concern. However, without requiring the Government to prove that officers had more than a "mere inchoate or unparticularized suspicion or hunch" regarding the presence of a dangerous individual inside a dwelling, the narrowly-crafted protective sweep exception would be significantly eroded. To hold otherwise would allow officers "to conduct protective sweeps whenever they do not know whether anyone else is inside a home" and would create "an incentive for the police to stay ignorant as to whether or not anyone else is inside a house" in order to conduct a sweep. *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996). The undersigned finds that the testimony solicited from the officers by the Government, even if fully credited, does not rise to more than a mere suspicion that a dangerous individual was inside the apartment. Accordingly, the undersigned concludes that the Government has failed to meet its burden showing that the

protective sweep exception to the Fourth Amendment's warrant requirement applies.[20] [21] [22]

---

[20] *See United States v. Scott*, 517 F. App'x 647, 649 (11th Cir. 2013) (holding that officers, who received an anonymous tip that the defendant was a felon in possession of a firearm, did not possess reasonable belief that someone was inside the defendant's residence after smelling marijuana coming from the house but not observing any signs to indicate that another individual was inside); *United States v. Chaves*, 169 F.3d 687, 691-92 (11th Cir. 1999) (holding that the warrantless entry of a warehouse under the auspices of conducting a protective sweep did not comport with the Fourth Amendment where the Government's argument rested on a lack of information about the building and the suspicion that it would be guarded with an armed individual because it may have contained a large shipment of cocaine); *United States v. Sunkett*, 95 F. Supp. 2d 1367, 1372-73 (N.D. Ga. 2000) (rejecting as insufficient evidence that another person could be in the house the facts that "at some unspecified previous time, someone in the management office had seen individuals going in and out of the apartment, that defendant had a wife or girlfriend in [a nearby county], and that she had paid his rent for the month on his . . . apartment).

[21] *But see Brand v. Casal,* 877 F.3d 1253, 1265-66 (11th Cir. 2017) (holding that reports of a man near the rear of the house along with the presence of another identified individual justifiably gave officers reason to believe there might be another person somewhere in the house and that, because a violent encounter had just transpired with one of the residents, that another person in the house could present a danger); *United States v. Goodrich*, 739 F.3d 1091, 1094-97 (8th Cir. 2014) (holding that officers were justified in conducting a protective sweep of a home where police responded to a break-in, were told by a witness that he had heard a gunshot, and saw individuals moving around inside the house); *Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003) (holding that a protective sweep was justified where officers responded to a 911 call that an individual was stabbed at a certain residence and officers arrived to find an individual drunk, bleeding from a deep cut on his hand, and demanding assistance from paramedics); *United States v. Mason*, 966 F.2d 1488, 1492-93 (D.C. Cir. 1992) (holding that a protective sweep was permissible where officers responded to a 911 call, arrived on the scene to find an individual who had been shot, the individual told them two masked men attacked him from inside his apartment, and officers heard what they believed to be voices coming from inside).

[22] The undersigned notes that the Government cites one case—*Warden Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-299 (1967)—in its brief in opposition to Defendant Turner's motion for suppression to support the application of the protective sweep exception. In so doing, the Government provides the court with a block quote stating that officers in *Hayden* acted reasonably in entering a house without a warrant to search for a robber when they received information that the robber had entered the dwelling "less than five minutes before they reached it." Doc. 29 at 2. The block quote continues to say that officers are not required to "delay in the course of an investigation" when it would "gravely endanger their lives or the lives of others." *Id*. At the suppression hearing, the Government again pointed the court to this case, and asserted that, in *Hayden*, the Supreme Court held that, based upon "a report of an armed robbery of an apartment," officers "had a right to go inside [the apartment] because at that point they didn't know if there was an armed robber inside." Tr. II-20:19-25. However, the facts of *Hayden* have been misconstrued by the Government and are easily distinguishable from the case at hand. Specifically, the undersigned points out that the house (not apartment) officers entered in *Hayden* was not the site of the robbery, but was instead the location where the robber took refuge after the robbery occurred. *Hayden*, 387 U.S. at 297 (noting that a robber entered the business premises of the Diamond Cab Company, took some money, and ran; two cab drivers followed the robber to the house in question and reported the information to police). Further, when officers arrived at the house, they knocked, informed Mrs. Hayden that they believed a robber had entered

III.    **CONCLUSION**

For all of the foregoing reasons, the undersigned RECOMMENDS that Defendant's "Motion to Suppress" (Doc. 17) be GRANTED.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **March 23, 2018**.   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.   Frivolous, conclusive, or general objections will not be considered by the District Court.   The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

---

the house, asked to search the house, and she offered no objection. *Id*. Therefore, while the *Hayden* court ultimately determined that, under those circumstances, it would not have been prudent for officers to take the time to secure a warrant to enter the house, the facts are very different from the ones here, where the perpetrator and his crew were reported to have fled the scene with no indication that they were holding up in the apartment or lying in wait for Defendant Turner's return.

Done this 9th day of March, 2018.


/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE